UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

| | | |
|---|---|---|
| RORY SNOWDEN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | 5:19-cv-192-JMH-MAS |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| SCHNEIDER ELECTRIC USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

\*\*\*

This matter comes before the Court on Defendant Schneider Electric USA, Inc.'s ("Schneider") Motion for Summary Judgment [DE 31]. In his Complaint [DE 1-1], Plaintiff Rory Snowden alleges Schneider racially discriminated against him in his employment as both an Assembler and Line Leader at Schneider. Snowden fails to show several essential elements of the claims raised against Schneider. Therefore, the Court will grant summary judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Rory Snowden was employed by Schneider from February 23, 2011, until his resignation in 2018. [DE 32, at 4 (citing [DE 32-3, at 19])]. He started as an Assembler on the production line of Schneider's Lexington plant, which primarily manufactures vehicle distribution and transmission equipment. *Id.* at 3-4; [DE 39, at 1]. Schneider's employees are represented by the International Brotherhood of Electrical Workers, Local 220 (the "Union"). [DE

32, at 4 (citing [DE 32-3, at 27]); DE 39, at 2]. In 2012, Snowden was promoted to the position of Line Leader, in which he supervised a small group of line workers. [DE 32, at 4 (citing [DE 32-3, at 19-20]); DE 39, at 1].

In 2013, Snowden had his first incident with Human Resources ("HR"). [DE 32, at 5]. Specifically, on October 20, 2013, Snowden's supervisor became aware of an altercation between Snowden and fellow Line Leader, Jeremy Atkinson. *Id.* Snowden's supervisor at the time, Tom Rawlins, reported to Pamela Macy, an HR Representative, that Snowden told Rawlins something along the lines of, "I'll kill him," referring to Atkinson because Snowden thought Atkinson called him a "nigger." [DE 32-3, at 39]; *see also* [DE 32, at 5; DE 39, at 2]. However, during Snowden's deposition, when he was questioned about Atkinson's alleged use of the racial slur, Snowden said, "It sounded like it," but he was unwilling to "swear on it." [DE 32-3, at 39]. Later that day, Snowden was brought in to meet with Macy, Rawlins, and two representatives from the Union to discuss the incident with Atkinson. [DE 32, at 5 (citing [DE 32-3, at 45-47; DE 32-4, at 106-110; DE 32-5, at 3-4, 85-89])]. During the meeting, Snowden admitted to saying he would kill Atkinson and was placed on a 10-day suspension, required to attend mandatory counseling, and given a "Last Chance Agreement," but he was not demoted at that time. [DE 32, at 5 (citing [DE 32-3, at 35-39, 48-49, 51-53; DE 32-4, at 106-110; DE

32-5, at 4, 85-89]); DE 39, at 2]. Macy's subsequent investigation into the incident led her to believe that Atkinson did not violate company policy, but he was nonetheless counseled on his behavior. [DE 32, at 6 (citing [DE 32-4, at 106-110; DE 32-5, at 4-5, 85-89])].

On April 24, 2017, Schneider was made aware of sexual harassment allegations against Snowden. [DE 32, at 6 (citing [DE 32-4, at 4, 113-24]. Four (4) days earlier, on April 20, 2017, Lara Walker was working alone in an enclosed "weld cell" when Snowden, the Line Leader for her group, entered the cell and began speaking with her. *Id.* During this conversation, Snowden allegedly stated, "'Have you ever been with a black man? I always wanted to be with a little white girl. Want to go to Horseshoes and have a drink? You just pack a bag and I will take care of everything.'" *Id*. at 6 (quoting [DE 32-4, at 5]); *see also* [DE 32-3, at 63-66; DE 32-4, at 113-124]. Walker asserted that she "nervously 'laughed it off' and 'told [Snowden] he was crazy.'" [DE 32-4, at 5]. After Snowden allegedly made these statements to Walker, George Cunningham, a mechanic, entered the cell, and Snowden stopped talking to Walker. *Id*. When investigating these claims, HR manager Shannon Phillips spoke with Theresa True, another Schneider employee, who informed Phillips that she too had a "run in" with Snowden. *Id*. Phillips spoke with Snowden, who admitted that he had asked Walker to meet him at the bar and that he had told Walker

3

about his past "'experiences,'" including that "'he had never been with a white girl.'" *Id.; see also* [DE 32-3, at 63-66].

At this interview, Snowden complained about how he felt that Cunningham and Walker's conduct was inappropriate. [DE 32-4, at 5]. Cunningham and Walker had previously been in a romantic relationship, and Cunningham told Phillips that "he had 'put his hands' on Walker recently 'just as friends.'" *Id.* at 6. Cunningham further asserted that he "did not kiss or grope [Walker] recently although he may have done so in the past on a consensual basis." *Id.* Cunningham and Walker were counseled "to act in an appropriate, respectful manner towards each other and their co-workers while at work." *Id.* at 7.

Despite Snowden's prior "Last Chance Agreement," Schneider did not terminate Snowden's employment due to the Walker incident. Instead, Phillips found that Snowden had "violated the Company's Policy against Sexual Harassment and Other Workplace Harassment," and Snowden was demoted to the Assembler position. *Id.* at 6-7. The new Line Leader who replaced Snowden was a Caucasian male. [DE 39, at 7].

After Snowden's demotion, on April 28, 2017, HR received complaints that Snowden was engaging in threatening behavior on the shop floor. [DE 32-4, at 7]. Snowden had allegedly been staring threateningly at Walker and an investigation by Phillips revealed that another woman had allegedly been subjected to Snowden's

4

inappropriate comments. *Id.* at 7-8. However, no further action was taken against Snowden. *Id.* at 8. Instead, Phillips "concluded that these employee statements were further corroborating evidence of Snowden's pattern of sexually harassing behavior, which further supported the decision to remove him from the Leader position." *Id.*

On April 24, 2018, Snowden went to Phillips to report an incident which had allegedly taken place five (5) days prior. [DE 39, at 3]. This incident involved Snowden seeing his Leader, Mike Jones, a white man, wearing a white packaging cone on his head for approximately one (1) minute. *Id.*; [DE 32, at 11]. Snowden was under the impression that the cone was intended to resemble the attire worn atop the heads of members of the Ku Klux Klan ("KKK"), and Snowden believed Jones's action to be one of racial intimidation. [DE 39, at 3]. Snowden thought Jones may have said something while he had the cone on his head, but during Snowden's deposition, he admitted that he did not hear what Jones said. [DE 32-3, at 86-87]. Phillips investigated this allegation and found that Snowden's two black coworkers who were present during the cone incident did not see the act as a racist gesture. *Id.* at 99; [DE 32-4, at 9-10]. Jones claimed that he was "just being silly" and that he thought the cone looked "like a party hat." [DE 32-4, at 9]. Phillips concluded that Jones did not intend to act in a racist or threatening manner, but she still instructed Jones to

5

throw the cone away and counseled him to be more careful about how his actions may be perceived. *Id.* at 9-10.

On April 27, 2018, Phillips told Snowden that she found Jones's actions were not intended to be "racially inflammatory" and that his coworkers did not interpret them as such. *Id.* at 10. Additionally, Phillips informed Snowden that during her investigation, Phillips discovered that other Schneider employees in Snowden's group were uncomfortable with him. *Id.* Phillips informed Snowden that his coworkers "deserved respect," that they "should feel comfortable working in the group," and that "bullying is prohibited and can interfere with other employees' peace of mind or ability to work." *Id.* Finally, Phillips "reminded Snowden of Schneider Electric's Harassment and Workplace Violence Policies and directed him to comply with those policies and to treat his fellow employees in a respectful manner." *Id.* at 10-11; *see also id.* at 125-132.

On April 30, 2018, Schneider received reports that Snowden made further threatening remarks. [DE 32-4, at 136-38]. Specifically, one of Snowden's coworkers reported that Snowden had stated that he was a "'messenger from God'" and that they would see "'this place on the news next week.'" *Id.* at 137. Based on these comments, Snowden was suspended while HR investigated the comments and awaited Phillips's return the following Monday, as Phillips was out of the office. *Id.* Snowden claims he made the

6

statements regarding his intent to call a local news station to report the allegedly "racially hostile environment" at Schneider. [DE 39, at 3]. Following his suspension, Snowden was escorted out of the building, and approximately an hour later, sent a text message to his Union representative informing them that he was resigning. [DE 32, at 15; DE 39, at 3]. On May 7, 2018, Phillips received Snowden's letter of resignation from Snowden's Union representative. *Id.*

On April 5, 2019, Snowden filed his Complaint [DE 1-1, at 2-5] in Fayette Circuit Court claiming Schneider subjected him to racial discrimination in violation of the Kentucky Civil Rights Act ("KCRA"), specifically KRS § 344.040, and created a racially hostile work environment that resulted in Snowden being constructively discharged from his job. On May 1, 2019, Schneider removed this matter to this Court. [DE 1]. On January 31, 2020, Schneider file the present Motion for Summary Judgment [DE 31] and an accompanying Memorandum in Support [DE 32], which shall be discussed further herein.

## II. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a

7

reasonable jury could return a verdict for the nonmoving party.'" *Olinger v. Corporation of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Stated another way, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Pennington,* 553 F.3d at 450 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).

The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts demonstrating the existence of a genuine issue for trial. Fed. R. Civ. P. 56; *Hall Holding*, 285 F.3d at 424 (citing *Celotex*, 477 U.S. at 324). Moreover, "the nonmoving party must do more than show there is

8

some metaphysical doubt as to the material fact. It must present significant probative evidence in support of its opposition to the motion for summary judgment." *Hall Holding*, 285 F.3d at 424 (internal citations omitted).

The Court "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Pennington v. State Farm Mut. Automobile Ins. Co.,* 553 F.3d 447, 450 (6th Cir. 2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). However, the Court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id.*

## III. DISCUSSION

Schneider moves for summary judgment, asking the Court to dismiss Snowden's claims with prejudice. [DE 32, at 31]. Each of Schneider's arguments shall be discussed in turn.

## A. EMPLOYMENT DISCRIMINATION

"'The language of the KCRA generally tracks the language of Title VII and, thus, should be interpreted consonant with federal interpretation.'" *Meads v. Lexington-Fayette Urban Cty. Gov't*, No. 15-5310, 2016 U.S. App. LEXIS 23776, at *5 (6th Cir. Jan. 20, 2016)

9

(quoting *Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 793 (6th Cir. 2000)). Although not clearly stated, the Parties appear to agree that Snowden's discrimination claim is a single-motive claim, which means this claim must be "analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later modified by *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006); *see also* [DE 32, at 17-18; DE 39, at 5]. Under a single-motive claim framework, the plaintiff must first establish by the preponderance of the evidence a *prima facie* case of discrimination. *Wright*, 455 F.3d at 706. If the plaintiff can show a *prima facie* case, the burden then shifts to the defendant to "'articulate some legitimate, nondiscriminatory reason'" existed for the allegedly adverse treatment. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (quoting *Green*, 411 U.S. at 802); *see also Wright*, 455 F.3d at 706. Lastly, "should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253 (citing *Green*, 411 U.S. at 804); *see also Wright*, 455 F.3d at 706.

10

## **1. PRIMA FACIE CASE**

To establish a *prima facie* case of employment discrimination under the KCRA, Snowden must show that (1) he was a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for his position; and 4) he was replaced by someone outside of the protected class or treated differently than similarly-situated, non-protected employees. *Wright*, 455 F.3d at 707.

In the present case, Snowden is indisputably a member of a protected class because he is black. Snowden claims, "Defendant argues that the Complainant did not suffer an adverse employment decision." [DE 39, at 5]. However, that is not what Schneider argues.[1] Instead, Schneider asserts, "To the extent Snowden claims

---

[1]   This is one of many inaccurate statements made in Snowden's Response [DE 39] and Affidavit [DE 39-1]. In addition to Snowden and his counsel's unfounded assertions, which are too numerous to include herein, many of the citations found in Schneider's Memorandum [DE 32] are in the improper order. By placing citations in the incorrect order, Schneider's counsel initially gives the impression that Schneider's counsel is misrepresenting the contents of documents in the record. Only after spending a considerable amount of time sorting through each of the citations was the able Court to discover that counsel habitually cites to documents, and even directly quotes documents, that are not the first citation after the body of the sentence. Going forward, when Schneider's counsel files pleadings with the Court, their citations should conform with the standards found in the *Bluebook*.

Regarding Schneider's request for the Court to impose sanctions against either Snowden or his counsel, *see* [DE 45, at 3-8], the Court will not do so at this time. While many of Snowden's assertions that Schneider argues are improper misrepresentations of fact could, in fact, be deliberate misrepresentations, they could just as easily be the result of poor factchecking,

that the Written Reprimand . . . is an adverse action, such a claim fails because the Written Reprimand itself did not change his hourly wage, benefits, duties or responsibilities." [DE 39, at 18 (citing *Handshoe v. Mercy Med. Ctr.*, 34 F. App'x 441, 447 (6th Cir. 2002) (finding a "write-up" to be "insufficient to rise to the level of a materially adverse employment *action*"); *Allen v. Michigan Dept. of Corr.*, 165 F.3d 405 (6th Cir. 1999); *Marshall v. Super Serv. LLC*, No. 6:14-229-DCR, 2016 WL 1389595, at *8 (E.D. Ky. Apr. 6, 2016)). Additionally, Schneider concedes that Snowden's demotion from the Leader position "may constitute an adverse employment action that is sufficient to support a claim for race discrimination" but argues, "[H]e was removed from the Leader position for legitimate, non-discriminatory reasons unrelated to his race," which the Court will consider further

---

proofreading, and analysis. Many of the assertions could also just be Snowden's opinion. For example, Schneider takes umbrage with Snowden's assertion that his altercation with Atkinson was the cause of his demotion years later. To be sure, the Atkinson incident did not coincide with Snowden's demotion. However, it is at least arguable that the Atkinson incident being part of Snowden's disciplinary history with Schneider, coupled with his later actions, led Schneider to demote Snowden. Snowden's counsel would serve himself, opposing counsel, and the Court well to take more care to ensure that what he presents to the Court is factually supported and accurate. The Court gives Snowden's counsel the benefit of the doubt, but many of Snowden's supposed factual assertions and the way his counsel has supported arguments with said assertions give the Court pause. The Court hopes Snowden's counsel takes this second chance to heart because the Court may not be as forgiving if Snowden's counsel exhibits similar behavior in the future.

herein. [DE 32, at 18-19]. The Court agrees that a warning, such as the Written Reprimand in this case, does not amount to an adverse employment action. However, a demotion certainly is, and Schneider agrees with that determination. *See* [DE 32, at 18-19; DE 45, at 8-9]. Additionally, a Caucasian male replaced Snowden as Leader, which establishes the fourth prong of the *prima facie* case, so the Court need not consider whether Snowden was treated differently than similarly situated white employees.

Nevertheless, to the extent Snowden attempts to argue Phillips treated Walker and Cunningham, who Snowden claims behaved similarly to him, more favorably than Phillips treated Snowden because Walker and Cunningham were white, the argument is unpersuasive. *See* [DE 39, at 7]. "'[T]o make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are similarly-situated *in all respects*.'" *Lewis-Smith v. W. Kentucky Univ.*, 85 F. Supp. 3d 885, 899 (W.D. Ky. 2015), *aff'd* 15-5146 (6th Cir. Jan. 12, 2016) (citing *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992)). Neither Walker nor Cunningham were Leaders, and while their conduct was inappropriate for the workplace, it was consensual. Following the investigation, Phillips counseled Walker and Cunningham to behave in an appropriate manner when they were at work, so they were given a warning, which is essentially the same punishment Snowden received

13

after his first offense, the Atkinson incident. Walker and Cunningham did not receive a Last Chance Agreement, like Snowden, but their alleged conduct was not as severe and involved consensual, albeit inappropriate, acts. There is also no evidence in the record that Walker and Cunningham had a disciplinary history, and at the time of his demotion, Snowden did. In fact, prior to Phillips's warning, there is no evidence that either Walker or Cunningham had ever been disciplined while working at Schneider.

Despite being able to meet his burden to show three out of four of the elements of the *prima facie* case, Snowden fails to demonstrate that he was qualified for the position. To demonstrate that he was qualified for the position of Leader, Snowden must show that he was performing his job at a level that met Schneider's legitimate expectations at the time of his demotion. *Robinson v. Dixie Consumer Prod., LLC*, No. 5:09-242-JMH, 2011 WL 1430276, at *5 (E.D. Ky. Apr. 14, 2011) (citing *Vincent v. Brewer Co*, 514 F.3d 489, 495 (6th Cir. 2007)). Arguing that Snowden was failing to meet Schneider's legitimate expectations when he was removed from the Leader position, Schneider states, "[T]he Company had a legitimate expectation that its Leaders . . . would comply with the Company's Policy Against Sexual Harassment and Other Workplace Harassment, and Snowden failed to comply with this and other policies on multiple occasions." [DE 32, at 19].

14

In *Robinson*, this Court found the plaintiff failed to demonstrate that she met her employer's legitimate expectations where "[t]he Code of Conduct clearly set[] out [the employer's] expectations for its employees' behavior, and [the plaintiff] was repeatedly warned that her behavior violated the Code of Conduct." 2011 WL 1430276, at *7. Prior to the plaintiff's termination, the plaintiff had an incident that could have resulted in her termination, but she was instead issue a Last Chance Agreement. *Id.* A few months later, the plaintiff was issued an oral warning, which escalated to another written warning when the problematic behavior continued. *Id.* After another incident and a contentious meeting regarding it, the employer found the plaintiff violated the Code of Conduct and terminated her employment. *Id.* This Court found the plaintiff's repeated failure to comply with the Code of Conduct, even after receiving several warnings, showed the plaintiff failed to meet the employer's legitimate expectations at the time of her termination, and the plaintiff failed to demonstrate otherwise.

Like the plaintiff in *Robinson*, Snowden received a warning, in the form of a Last Chance Agreement, prior to his demotion. Specifically, after the incident where Snowden threatened to kill Atkinson, Snowden signed a Last Chance Agreement. The incident with Atkinson coupled with Snowden's incident with Walker that resulted in his demotion and True's comments to Phillips about a

15

similar encounter with Snowden show he was not complying with Schneider's policies and was, therefore, not meeting Schneider's legitimate expectations for a Leader. Furthermore, after the demotion, it was revealed that another female coworker was allegedly subjected to Snowden's inappropriate comments. However, even without considering True and the other female coworker's allegations, the Atkinson and Walker incidents alone show Snowden was not meeting Schneider's legitimate expectations, and Snowden does not meet his burden to show that he was meeting those expectations. Thus, Snowden fails to establish a *prima facie* case of discrimination.

## 2. NONDISCRIMINATORY REASONS AND PRETEXT

Even if Snowden could meet his initial burden of establishing a *prima facie* case, he has failed to show that Schneider's legitimate, nondiscriminatory reasons for demoting him were a pretext for unlawful discrimination. Schneider asserts that "[i]t is undisputed that Phillips removed Snowden from the Leader position based on her belief that he had engaged in inappropriate and unprofessional behavior and violated the Company's Policy Against Sexual Harassment and Other Workplace Harassment, and considering his history of misbehavior." [DE 32, at 24 (citations omitted)]. "If an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretext by showing the

employer was ultimately incorrect." *Robinson*, 2011 WL 1430276, at *7 (citing *Allen v. Highlands Hosp. Corp.,* 545 F .3d 387, 398 (6th Cir. 2008)). "'[T]he key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.'" *Id.* (quoting *Martin v. Toledo Cardiology Consultants, Inc.,* 548 F.3d 405, 414 (6th Cir. 2008)). "'The employee then has the opportunity to introduce contrary evidence, but the decisional process need not be optimal, only reasonably informed and considered.'" *Id.* (quoting *Russell v. Univ. of Toledo*, 537 F.3d 596, 605 (6th Cir. 2008)).

In the present case, Snowden denies that he sexually harassed Walker, but he fails to show Schneider's decision was not reasonably informed and considered. To the contrary, as previously shown herein, Schneider, namely Phillips, conducted several interviews with employees, including Snowden, Walker, Cunningham, and True, before making her determination to remove Snowden from the Leader position. Not only was Phillips's decision reasonably informed and considered, she showed restraint by opting to demote Snowden instead of terminating his employment despite his earlier Last Chance Agreement. Regardless of whether Snowden disagrees with Phillips's decision or believes the demotion was excessive, Snowden has not shown Phillips's decision to be anything other than an honest belief that he should have been demoted due to his alleged sexual harassment. Therefore, Snowden has failed to show

Schneider's legitimate, nondiscriminatory reason for demoting him was a pretext for discrimination, and Schneider must be granted summary judgment on Snowden's racial discrimination claim.

### B. HOSTILE WORK ENVIRONMENT

Snowden's hostile work environment claim also lacks a genuine dispute of material fact and requires summary judgment. In *Hafford v. Seidner*, the Sixth Circuit outlined the elements for a *prima facie* case of a hostile work environment based on race as follows: (1) the person was a member of a protected class; (2) the person was subjected to unwelcomed racial harassment; (3) the harassment was based on race; (4) the harassment unreasonably interfered with the person's work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable. 183 F.3d 506, 512 (6th Cir. 1999).

As previously stated herein, there is no dispute that Snowden is a member of a protected class. On the contrary, whether Snowden was subjected to any harassment is contested. The only two occurrences that could potentially be construed as racial harassment were the paper cone incident and an earlier incident where Snowden thought Atkinson used a racial slur. Schneider found the paper cone incident to not be racially motivated, and Snowden's black coworkers who were present for the incident did not perceive it as such. *See* [DE 32-3, at 99; DE 32-4, at 9-10]. Snowden initially claimed that Jones may have said something while the

paper cone was on his head, but Snowden later stated in his deposition that he did not hear what Jones said. [DE 32-3, at 86-87]. Similarly, Snowden originally asserted that he threatened to kill Atkinson because he called Snowden a "nigger," but during Snowden's deposition, he admitted that he could not swear that Atkinson said the word. *See* [DE 32, at 5; DE 32-3, at 39; DE 39, at 2]. Despite finding Snowden's claims about Jones and Atkinson to be exaggerated or not as he perceived them, Schneider counseled both Jones and Atkinson about their behavior. [DE 32-4, at 9-10; DE 32, at 6 (citing [DE 32-4, at 106-110; DE 32-5, at 4-5, 85-89])].

By construing the facts most favorably to Snowden, the non-moving party, and ignoring Snowden's own uncertainty about whether Jones or Atkinson said anything racist, the two acts could be considered instances of unwelcomed racial harassment. However, as Schneider correctly asserts, "Even if Atkinson called Snowden a 'Nigger' as he alleges, a single remark by a co-worker nearly seven years ago is time barred by the 5-year statute of limitations under the KCRA and cannot establish actionable harassment." [DE 45, at 17]; *see also Scott v. FedEx Ground Package Sys., Inc.*, No. CV 5:19-412-DCR, 2019 WL 5967950, at *2 (E.D. Ky. Nov. 13, 2019) (quoting *Ammerman v. Bd. of Educ.*, 30 S.W.3d 793, 798 (Ky. 2000) ("Under the KCRA, '[c]ivil rights claims are governed by the five-year statute of limitations provided in KRS 413.120(2))."

Regardless of the claims regarding Atkinson's alleged use of a racial slur being time-barred, the hostile work environment claim fails on the fourth prong, as Snowden has shown no evidence indicating that the harassment was so severe that it interfered with his work performance.

To meet the fourth prong, a plaintiff must show that there was conduct "'severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard the environment as abusive.'" *Handshoe v. Mercy Med. Ctr.,* 34 F. App'x 441, 448 (6th Cir. 2002) (quoting *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000)). "[T]he hostile work environment 'must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Lindsey v. Whirlpool Corp.* 295 F. App'x. 758, 766 (6th Cir. 2008) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)). In determining whether harassment was severe and pervasive, the Court, looking at the totality of the circumstances, must consider the following factors: "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Handshoe,* 34 F. App'x at 448 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)).

Here, Snowden cites *Robinson v. Coca-Cola Enterprises, Inc.*, No. 1:06-CV-371, 2007 WL 2948869 (S.D. Ohio Oct. 9, 2007) to support his position that "[r]epeated, though infrequent, instances of racial slurs and imagery are sufficient to create a hostile work environment." [DE 39, at 9]. However, there are stark differences between *Robinson* and the present case.

In *Robinson*, the United States District Court for the Southern District of Ohio found that a reasonable juror could find that workers at a Coca-Cola plant were subjected to a racially hostile work environment. *Robinson*, 2007 WL 2948869, at *14. The *Robinson* plaintiffs alleged incidents of physical assault while being subjected to the repeated use of racial slurs, supervisors favoring white employees while scolding black employees for the same behavior, and incidents of racist graffiti being written in the bathroom. *Id.* at 1-5. White supervisors allegedly mocked black workers, used racial slurs, and turned the other way while white employees harassed the black plaintiffs. *Id.*

The alleged work environment in *Robinson* is a world apart from the one Snowden alleges existed at Schneider, in which a single employee, Jones, put a white paper cone on his head, Jones and Atkinson *may* have said something racist that Snowden could not confirm he heard and no other employee could corroborate, and both Jones and Atkinson were counseled by HR to behave more professionally in the future. Concerning the paper cone incident

21

with Jones, Snowden went so far as to admit that he could not hear what he thought Jones said. [DE 32-3, at 86-87]. At best, Snowden, considering the paper cone incident to be racially motivated, appears to assume that if Jones said something, it was racist. This is an unreasonable inference, unsupported by the testimony of Snowden and other black employees present at the paper cone incident, and the Court will not allow Snowden to use it in his favor.

Without any evidence that Jones actually said anything, the Court is left with nothing more than Snowden's belief, which was not shared by any other black employee present for the incident, that Jones placing a paper cone on his head was racist and not just a juvenile, unprofessional act. Snowden may satisfy the subjective component of the fourth element because he perceived the paper cone incident to be racist, but he has failed to show that a reasonable person would find the incident hostile or abusive. *See Lindsey*, 295 F. App'x at 766 (quoting *Faragher*, 524 U.S. at 787. There is no evidence suggesting the paper cone incident was intended as an act of racial hostility, so the Court is unable to consider the paper cone incident as severe. *See Lindsey*, 295 F. App'x. at 766 (quoting *Faragher*, 524 U.S. at 788 ("The harassment 'must be extreme to amount to a change in the terms and conditions of employment'. . .'[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will

22

not amount to discriminatory changes in terms and conditions of employment.'")); *see also Barrett v. Whirlpool Corp.*, 556 F.3d 502, 517 (6th Cir. 2009) (quoting *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 716 (3d Cir. 1997) ("'[M]ute gestures' such as squinting and shaking one's fists 'cannot itself be characterized as particularly severe.'")).

Even if the paper cone incident and the confrontation with Atkinson, were assumed to be acts of racial hostility, the fact that they were two infrequent events separated by several years, both of which HR intervened in and attempted to remedy, precludes the Court from finding that these incidents are enough to constitute severe and pervasive harassment. Moreover, Snowden fails to show that the incidents involving Jones and Atkinson negatively affected his work performance. If anything, the record shows that any disruption following the incidents was caused by Snowden's behavior. Therefore, the Court will grant summary judgment on Snowden's hostile work environment claim.

## C. CONSTRUCTIVE DISCHARGE

"To demonstrate constructive discharge, a plaintiff must adduce evidence to show that (1) 'the employer . . . deliberately create[d] intolerable working conditions, as perceived by a reasonable person,' (2) the employer did so 'with the intention of forcing the employee to quit,' and (3) 'the employee . . . actually quit.'" *Goldfaden v. Wyeth Labs., Inc.*, 482 F. App'x 44, 48 (6th

23

Cir. 2012) (quoting *Moore v. KUKA Welding Sys. & Robot Corp.,* 171 F.3d 1073, 1080 (6th Cir. 1999)). "'To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined.'" *Id*. "Intent can be shown by demonstrating that quitting was a foreseeable consequence of the employer's actions." *Goldfaden*, 482 F. App'x at 48.

In the present case, there is no indication that Schneider had any intent to force Snowden to quit. In fact, given Snowden's disciplinary record, it appears that Schneider was working quite hard to keep Snowden employed. After the Walker incident, even though Snowden had a Last Chance Agreement, Schneider demoted him instead of terminating his employment. Snowden attempts to compare his case to *Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121 (6th Cir. 1998) in which the Court of Appeals for the Sixth Circuit found the doctrine of constructive discharge applied because the plaintiff had "'no definite prospect of continued employment with the company.'" [DE 39, at 11 (quoting *Scott*, 160 F.3d at 1128)]. However, Snowden's demotion does not indicate that he had no prospect of continuing to be employed by Schneider. He was no longer a Line Leader, but there is no indication in the record that Snowden's position as an Assembler was threatened or that a demotion would foreseeably lead Snowden to resign. Snowden's suspension while his remarks regarding Schneider being on the news

also fails to allude to him having no prospects of continued employment, especially when the Court considers the fact that his suspension after the Atkinson incident did not lead to his termination.

Furthermore, Snowden's constructive discharge claim, like his hostile work environment claim, fails because has not shown that Schneider deliberately created intolerable working conditions, as perceived by a reasonable person. Snowden may have subjectively perceived his working conditions as such, but as has been repeatedly shown herein, his black coworkers did not agree with his perception, and they certainly did not find the conditions so appalling that they resigned. Accordingly, the Court will grant summary judgment on Snowden's constructive discharge claim.

### IV. CONCLUSION

For the foregoing reasons, each of Snowden's claims against Schneider should be dismissed. Accordingly, having considered the matter fully, and being otherwise sufficiently advised,

**IT IS ORDERED** as follows:

(1) Defendant Schneider Electric USA, Inc.'s Motion for Summary Judgment [DE 31] is **GRANTED**;

(2) Schneider's Reply [DE 45], insofar as it requests that the Court impose sanctions under Federal Rule of Civil Procedure 11, is **DENIED**;

(3) This matter is **DISMISSED WITH PREJUDICE**; and

(4) This is a final and appealable order.

This 14th day of October, 2020.



Signed By:

*Joseph M. Hood*

Senior U.S. District Judge